IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ACR MACHINE, INC., | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE HARFORD MUTUAL | : | |
| INSURANCE COMPANY | : | NO. 05-CV-04776 |
|     Defendant. | : | |

MEMORANDUM

LEGROME D. DAVIS, J.                                                                                                      May 31, 2006

      Presently before this Court is Defendant's Motion for Summary Judgment (Doc. No. 9, 10) and Plaintiff's Response thereto (Doc. No. 11-13). For the reasons set forth below, Defendant's Motion for Summary Judgment is denied.

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

      On August 12, 2005, ACR Machine, Inc. ("ACR") filed a complaint in the Delaware County Court of Common Pleas against Harford Mutual Insurance Company ("Harford"), alleging that Harford breached its insurance contract with plaintiff when it refused to reimburse plaintiff for the loss of sixty-one (61) mechanical housings. On September 6, 2005, Harford removed this matter to the United States District Court for the Eastern District of Pennsylvania based on diversity jurisdiction.

      ACR is a corporation operating a job shop that primarily machines metal.[1] Def's

---

[1] Job shops are small manufacturing operations that handle specialized manufacturing processes.

Statement of Undisputed Facts ("Def's Facts") ¶ 6. Andrew C. Ruszkay, Jr. is the sole shareholder and serves as ACR's President. Id. Andrew C. Ruszkay, Jr.'s father, Andrew Ruszkay, Sr., is employed by ACR, Darlene Schroder is ACR's administrative assistant, and Edward Follett is ACR's government contract administrator. Id. ¶¶ 6, 39.

On December 13, 2002, ACR entered into a contract with the United States Government, Department of Army, Tank Automotive Command ("TACOM"). Id. ¶ 8. The contract required ACR to provide TACOM with 98 machined mechanical housings, which were to be delivered in installments between March 5, 2004 and August 13, 2004.[2] Id. After purchasing the mechanical housings from a company called Gray-Syracuse, ACR had them sent directly to Sermatech, a company that had agreed to coat the mechanical housings. Id. ¶¶ 9-10, 13. Gray-Syracuse's records confirm that 98 mechanical housings were sent to Sermatech for ACR during the period between September 9, 2003 and August 6, 2004. Id. ¶ 12. Andrew Ruszkay, Sr. picked up the mechanical housings coated by Sermatech and transported them to ACR in his truck on a number of occasions. Id. ¶ 14. Sermatech identified 97 mechanical housings on its invoices and packing slips for customer pickup by ACR.[3] Id. ¶ 15.

On August 13, 2004, TACOM terminated its contract with ACR for failure to deliver the supplies within the time required by the contract. Id. ¶ 22. ACR never delivered any mechanical housings to TACOM and did not perform any work on the mechanical housings after TACOM terminated the contract. Id. ¶¶ 24, 25. In August or September of 2004, ACR stored all of the

---

[2] The mechanical housings are also called "castings." A mechanical housing is 15 inches in diameter and weighs approximately 40 pounds. Def's Memo., Ex. J at 3.

[3] According to Sermatech's records, 81 of the mechanical housings were coated and diffused and 16 were not. Def's Facts ¶ 17. ACR paid Sermatech $19,185 for its services. Id.

mechanical housings in its possession at its machine shop, located at the intersection of Tenth Avenue and Chestnut Street in Coatesville, Pennsylvania. Id. ¶ 26.  ACR did not count the number of mechanical housings on its property between August 13, 2004 and March 30, 2005. Id. ¶ 28.

In a letter to Barnes Aerospace ("Barnes") dated March 24, 2005, Mr. Follett stated that ACR had mechanical housings in stock that it was willing to sell to Barnes Aerospace. Id. ¶ 29. On March 30, 2005, Barnes called ACR to inquire about purchasing the mechanical housings. Id. ¶ 30.  Barnes wanted to know how many mechanical housings ACR had, including the number of mechanical housings that had undergone any machining process. Id.

As a result of the call from Barnes, Andrew Ruszkay, Sr. went to the location where the mechanical housings were stored. Pl's Resp. to Def's Facts ("Pl's Facts") ¶ 31.  Some of the mechanical housings were outside of their boxes, and Andrew Ruszkay, Sr. placed them back into boxes. Def's Facts ¶ 32.  At some point, Andrew Ruszkay, Sr. realized that some of the mechanical housings were missing. Pl's Facts ¶ 34.  He immediately informed his son, Andrew C. Ruszkay, Jr., who looked around the shop and questioned Ms. Schroder and Mr. Follett to see if the items had been moved. Def's Facts ¶ 35; Andrew C. Ruszkay Depo. at 48-49.  ACR reported the missing mechanical housings to the Coatesville Police Department that day, March 30, 2005. Def's Facts ¶ 42.

Approximately 58 of the 97 mechanical housings disappeared sometime between August 13, 2004 and March 30, 2005.[4]  See id. ¶ 41; Def's Mot. for Summ. J. ¶ 15.  According to Andrew

---

[4] The parties agree that 39 mechanical housings remained; however, there is some dispute over whether there were 97 or 98 (or even 100) mechanical housings in ACR's possession initially.  Since the records from Sermatech indicate that 97 mechanical housings were picked up

C. Ruszkay, Jr., Andrew Ruszkay, Sr., Ms. Schroder and Mr. Follett, there were no break-ins, forced entries, or employee thefts at ACR within the five years preceding December 1, 2005. Def's Facts ¶ 39. The police investigation revealed no signs of forced entry at ACR and no evidence of ACR employee theft.[5] Id. ¶ 45.

Plaintiff ACR claims that it is entitled to insurance benefits for the loss of the mechanical housings pursuant to insurance policy No. 9040320 ("Policy") issued by Defendant Harford. See id. ¶ 2. The Policy is for the period from December 31, 2004 to December 31, 2005. Id. Defendant Harford claims that a limitation in the Policy applies and, therefore, plaintiff's loss is not covered under the Policy.

II.   LEGAL STANDARD

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986). All reasonable inferences from the record are drawn in favor of the non-movant. See Anderson, 477 U.S. at 255; J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921 (1991).

III.   DISCUSSION

---

by ACR and since plaintiff "admitted" that it discovered the loss of approximately 58 of the 97 mechanical housings, this Court will assume, for purposes of this motion, that ACR originally had 97 mechanical housings. See Pl's Resp. to Def's Mot. for Summ. J. ¶ 15.

[5] The police investigation was limited. See Def's Facts ¶¶ 43-45.

Under Pennsylvania law, a court, rather than a jury, generally interprets the language of an insurance contract. 12th Street Gym v. General Star Indem. Co., 93 F.3d 1158, 1165 (3d Cir. 1996) (citing Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)).  Where the language of the contract is clear and unambiguous, it must be given its plain and ordinary meaning. Id. (citing Pennsylvania Mfr. Ass'n Ins. Co. v. Aetna Casualty & Surety Ins. Co., 233 A.2d 548, 551 (Pa. 1967)).  The burden of establishing coverage under an insurance contract lies with the insured, while the burden of establishing a policy exclusion, which precludes coverage, rests with the insurer.  Erie Ins. Exchange v. Transamerica Ins. Co., 533 A.2d 1363, 1366 (Pa. 1987).

The Policy provides coverage for, inter alia, "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." See Policy, Building and Personal Property Coverage Form at 1. "Covered Property" includes "stock," which is defined as "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping." Id. at 1, 14.  "Covered Cause of Loss" means "risks of direct physical loss," unless the loss is excluded or otherwise limited by the terms of the policy. See Policy, Causes of Loss - Special Form at 1.  One such limitation is implicated in this case. The Policy provides that there is no coverage for loss or damage to "[p]roperty that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property." Id. at 5.

Defendant argues that plaintiff's loss is not covered under the Policy because (1) the shortage was disclosed upon taking inventory, (2) the shortage disclosed by the inventory was the

only evidence of loss and (3) there is no physical evidence to show what happened to the property. Def's Memo. at 3-13.  Plaintiff claims that the shortage was not discovered during the taking of an inventory, but rather when Andrew Ruszkay, Sr. went to prepare the mechanical housings for inspection by a potential buyer. Pl's Memo. at 2-5.  In the alternative, plaintiff argues that even if the shortage was disclosed on taking inventory, the shortage is not the only evidence of loss and the physical evidence supports the idea of a theft. Id. at 5-7.

A.       Shortage Disclosed on Taking Inventory

Missing property "where the only evidence of the loss or damage is a shortage disclosed on taking inventory" is not covered under the Policy.  Since the language of the contract is clear and unambiguous, it must be given its plain and ordinary meaning. See Better Environment, Inc. v. ITT Hartford Insurance Group, 96 F. Supp. 2d 162, 168 (N.D.N.Y. 2000) (finding an identical provision to be unambiguous).  Inventory is "an itemized list of current assets." Merriam-Webster's Collegiate Dictionary 658 (11th ed. 2003); see also Blacks Law Dictionary 830 (7th ed. 1999) (defining inventory as "a detailed list of assets"). "Taking inventory" means making an itemized list of assets.  The issue, therefore, is whether the shortage of mechanical housings was discovered when plaintiff was making an itemized or detailed list of assets.

The parties agree that Barnes wanted to know how many mechanical housings ACR had in its possession, including the number of mechanical housings which had not undergone any machining process, and that Andrew Ruszkay, Sr. went to the area where the mechanical housings were stored because Barnes had inquired about purchasing the items. See Def's Facts ¶¶ 30, 31; Pl's Facts ¶¶ 30, 31.  In his deposition, Andrew Ruszkay, Sr., a Hungarian immigrant, stated that he "went out there and [Barnes] want[ed] to know how many we have left not touched

yet. Then I went out and counting. And I just - I couldn't believe it." Andrew Ruszkay, Sr. Depo. ("A.R. Depo.") at 36.  He "went in there to count how many pieces and what stage they are, how much machine." Id. at 41.  He picked up each box and looked to see whether the mechanical housing was inside. Id. at 42.  Andrew Ruszkay, Sr. testified that he was panicking at this point, and, as a result, he did not take any notes on the number of pieces that had not been machined until later. Id.  He believes he made the list of the remaining items the following day. Id.; see Def's Memo., Ex. I.

In his deposition, Andrew C. Ruszkay, Jr. testified that the shortage was discovered when "[his] father went out to the shop to look at the castings." Andrew C. Ruszkay, Jr. Depo. ("A.C.R. Depo.") at 47.  He testified that his father, after finding empty boxes, asked him if he had moved any of the mechanical housings, and he responded that "they [were] where they put them." Id. at 48.  He and his father looked around the shop and questioned Ms. Schroder and Mr. Follett to see if anybody had moved the items. Id. at 48-49.  Andrew C. Ruszkay, Jr. told Chris Jackson in a recorded interview dated April 6, 2005 that his father "went to go look at the castings and notice[d] that they were, couldn't find them, ya know, didn't seem like they were all there." Def's Memo, Ex. J at 2.

Plaintiff argues that Andrew Ruszkay, Sr. "went to the area where the missing items were stored in an attempt to get them ready for an inspection by a potential buyer," not to take inventory. Pl's Memo. at 2.  However, even making all reasonable inferences in favor of plaintiff, the deposition testimony reveals that Andrew Ruszkay, Sr. went to the area where the mechanical housings were stored to count the number of mechanical housings and to determine the stage of machining for each piece – in other words, to take an inventory of the mechanical housings.

Even though it may have been almost immediately apparent to Andrew Ruszkay, Sr. that mechanical housings were missing, it does not negate the fact that the shortage was disclosed on taking inventory.

B.     Only Evidence of Loss

In order for the limitation to apply, the only evidence of loss must be a shortage disclosed on taking inventory. See Policy, Causes of Loss - Special Form at 5.  Plaintiff argues that the shortage disclosed on taking inventory is not the only evidence of loss.  Pl's Memo. at 5-7. Specifically, plaintiff claims that boxes which had previously contained mechanical housings were empty, that the alleged thieves had removed the castings and restacked the boxes to cover up the disappearance, and that the thieves only took the mechanical housings from the inside of the stacked pallets so that it was difficult to detect the loss. Id. at 6-7.  Defendant argues that ACR has no evidence as to how or when the mechanical housings became missing and no evidence that an employee or any other person stole the mechanical housings from ACR. Def's Memo. at 4-5.  Based on the plain and ordinary meaning of the contract, the issue is whether there is evidence of loss other than the shortage disclosed on taking inventory.

Andrew Ruszkay, Sr. testified that he found "empty boxes where piece is supposed to be there." A.R. Depo. at 45.  Similarly, Andrew C. Ruszkay, Jr. testified that some of the boxes did not contain castings when he examined the boxes on March 30, 2005. A.C.R. Depo. at 71-72. He also testified that the boxes were stacked on the skids in such a way that the skids appeared full even though boxes were missing. Id. at 59, 72-73.  The rearrangement of the stacked pallets to make the loss difficult to detect is evidence of concealment, not evidence of loss.  However,

the empty boxes, if the testimony is believed by the trier of fact, are evidence of loss.[6]  Making all reasonable inferences in favor of plaintiff, there is evidence of loss in addition to the shortage disclosed on taking inventory.  Therefore, the first part of the limitation clause does not apply.

C.       Other Instances Where There is No Physical Evidence

The limitation at issue provides that there is no coverage for loss or damage to "[p]roperty that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property."  See Policy, Causes of Loss - Special Form at 5.  Since this Court has determined that a reasonable trier of fact could find that there was evidence of loss in addition to the shortage disclosed on taking inventory, this Court must now examine the second part of the limitation.  If this is an instance where "there is no physical evidence to show what happened to the property," then the loss will not be covered under the Policy.

When asked what physical evidence existed to show what happened to the property, Andrew C. Ruszkay, Jr. responded,

> Empty boxes that were – had pieces in them.  How the pieces were stored on the skid in one of the sites.  They had piled like three high, and they took out the skids that were in the middle and in the back, and left the ones in the front and the front corners, and then like the back right corner there, and took out the rest of the pieces. So if you were to walk to past it you would still see the stacked machine pieces appearing to be fully filled up on each skid, when they might only have three pieces on a skid or enough to just balance it there.

A.C.R. Depo. at 59.  The Coatesville Police Report filed on March 30, 2005, the day the shortage was discovered, notes that, according to Andrew C. Ruszkay, Jr., the "actor had removed the pieces from inside of the stack. This gave the appearance that the pallets were still stacked."

---

[6] Defendant does not contend that there were not empty boxes.

Def's Memo., Ex. K.  The rearrangement of boxes on the pallets in order to disguise the loss is physical evidence that shows what happened to the property, i.e. that it was stolen.[7]

There is some conflicting testimony regarding whether the boxes had been rearranged on the pallets to disguise the loss.  When Andrew Ruszkay, Sr. was asked if there was any evidence that someone tried to move the boxes to hide the fact that certain of the mechanical housings were missing, he said no.  A.R. Depo. at 47-48.  A reasonable trier of fact could find that the boxes were rearranged in order to hide the loss; however, a reasonable trier of fact could also determine that the boxes had not been moved to disguise the loss.  Given the conflicting testimony, this Court finds that a material issue of fact exists.  As a result, the Court is unable to determine whether the second part of the limitation applies.

IV.   CONCLUSION

Accordingly, defendant's motion for summary judgment is denied.   An appropriate order follows.

---

[7] Defendant argues that there was no evidence of forced entry or burglary, no evidence of tampering with the boxes, and no evidence regarding when the mechanical housings were allegedly stolen. Def's Memo. at 13.  While this is true, the Policy does not require any specific evidence; it only requires "physical evidence to show what happened to the property."